**2012-1688**

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

AMS ASSOCIATES, INC.
(doing business as Shapiro Packaging),

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

LAMINATED WOVEN SACKS COMMITTEE, COATING EXCELLENCE
INTERNATIONAL, LLC, and POLYTEX FIBERS CORPORATION,

Defendants-Appellees.

Appeal from the United States Court of International Trade
in case no. 11-CV-0101, Senior Judge R. Kenton Musgrave.

**RESPONSE BRIEF OF DEFENDANTS-APPELLEES, LAMINATED
WOVEN SACKS COMMITTEE, COATING EXCELLENCE
INTERNATIONAL, LLC, AND POLYTEX FIBERS CORPORATION**

Joseph W. Dorn
Jeffery B. Denning

KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 737-0500

*Counsel for Laminated Woven Sacks
Committee, Coating Excellence
International, LLC, and Polytex Fibers
Corporation*

January 22, 2013

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

AMS ASSOCIATES, INC. V US

2012-1688

Certificate of Interest

Counsel for Defendants-Appellees, Laminated Woven Sacks Committee, Coating Excellence International, LLC, and Polytex Fibers Corporation, certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Laminated Woven Sacks Committee, Coating Excellence International, LLC and Polytex Fibers Corporation

2.     The name of the real party in interest  (if the party named in the caption is not the real party in interest) represented by me is:

Same

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

King & Spalding LLP - Joseph W. Dorn, Jeffery B. Denning and Jeffrey M. Telep

Sarah K. Davis of King & Spalding LLP and Steven R. Keener, formerly of King & Spalding LLP, also appeared at the U.S. Court of International Trade and the U.S. Department of Commerce.

| January 22, 2013 | /s/ Joseph W. Dorn |
|---|---|
| Date | Joseph W. Dorn |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES…………………………………...……….....…......... ii

STATEMENT OF RELATED CASE ...................................................................v

STATEMENT OF THE ISSUE...........................................................................1

STATEMENT OF THE CASE.............................................................................1

STATEMENT OF THE FACTS .........................................................................3

SUMMARY OF THE ARGUMENT ..................................................................10

ARGUMENT ......................................................................................................11

I.      STANDARD OF REVIEW ........................................................................11

II.     COMMERCE'S DECISION TO DENY AIFUDI A SEPARATE
        RATE IS SUPPORTED BY SUBSTANTIAL EVIDENCE .......................11

        A.      Commerce Properly Refused To Consider Public Information
                That Could Not Be Verified ..............................................................13

        B.      Even If Commerce Were Required To Consider The Public
                Information Remaining On The Record After Aifudi Withdrew
                And Prevented Verification, That Information Does Not
                Establish That Aifudi Was Free From Government Control ..............17

                1.      Shapiro improperly attempts to shift the burden of proof
                        to Commerce ...........................................................................18

                2.      The public record does not establish that Aifudi operated
                        free from government control ..................................................19

III.    COMMERCE'S DECISION TO DENY AIFUDI A SEPARATE
        RATE IS NOT CONTRARY TO LAW .......................................................22

CONCLUSION ...................................................................................................25

19907162

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AMS Assocs., Inc. v. United States*,
  No. 11-00101, 2012 Ct. Intl. Trade LEXIS 100 (Ct. Int'l Trade July 27,
  2012) ....................................................................................................3, 22

*Bristol Metals, L.P. v. United States*,
  703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ......................................16

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938) ...........................................................................11

*F. Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
  216 F.3d 1027 (Fed. Cir. 2000) ..........................................................17

*Gerber Food (Yunnan) Co. v. United States*,
  491 F. Supp. 2d 1326 (Ct. Int'l Trade 2007) ......................................23

*Gerber Food (Yunnan) v. United States*,
  387 F. Supp. 2d 1270 (Ct. Int'l Trade 2005) ......................................23

*Heveafil Sdn. Bhd. v. United States*,
  58 Fed. App'x. 843 (Fed. Cir. 2003) ..................................................16

*Hontex Enters., Inc. v. United States*,
  248 F. Supp. 2d 1323 (Ct. Int'l Trade 2003) .................................14, 15, 16, 17

*Huaiyin Foreign Trade Corp. (30) v. United States*,
  201 F. Supp. 2d 1351 (Ct. Int'l Trade 2002),
  *aff'd*, 322 F.3d 1369 (Fed. Cir. 2003)................................................22

*Micron Tech., Inc. v. United States*,
  117 F.3d 1386 (Fed. Cir. 1997) ..........................................................11

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003) ..........................................................15

*PAM, S.p.A. v. United States*,
 582 F.3d 1336 (Fed. Cir. 2009) ............................................................15, 16, 17

*Qingdao Taifa Group Co. v. United States*,
 637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ......................................................23

*Shandong Huarong Gen. Group Corp. v. United States*,
 27 CIT 1568 (Ct. Int'l Trade 2003) .............................................................21, 23

*Sigma Corp. v. United States*,
 117 F.3d 1401 (Fed. Cir. 1997) .......................................................12, 13, 18, 21

*Since Hardware (Guangzhou) Co. v. United States*,
 No. 09-00123, 2011 Ct. Intl. Trade LEXIS 146 (Ct. Int'l Trade Nov. 29,
 2011) ....................................................................................................................14

*Thai Pineapple Pub. Co. v. United States*,
 187 F.3d 1362 (Fed. Cir. 1999) .........................................................................11

*Thyssen Stahl AG v. AK Steel Corp.*,
 No. 1997-1509, 1998 U.S. App. LEXIS 17064 (Fed. Cir. July 27, 1998) .........16

*Transcom, Inc., v. United States*,
 294 F.3d 1371 (Fed. Cir. 2002) .........................................................................12

## STATUTES AND LEGISLATIVE HISTORY

19 U.S.C. § 1516a(b)(1)(B) ....................................................................................11

19 U.S.C. § 1675(a)(2)(A)(ii) ...................................................................................6

19 U.S.C. § 1677e(a).........................................................................2, 9, 12, 15

19 U.S.C. § 1677e(a)(2)(D) ...................................................................................13

19 U.S.C. § 1677e(b) ..........................................................................................2, 9

19 U.S.C. § 1677m(i) ...........................................................................................15

*Uruguay Round Agreements Act, Statement of Administrative Action*,
 H.R. Doc. No. 103-316 (1994),
 *reprinted in* 1994 U.S.C.C.A.N. 4040 .............................................................15

- iii -

## AGENCY REGULATIONS AND DETERMINATIONS

19 C.F.R. § 351.307(b)(1)(iv) ...................................................................4

*Fresh Garlic from the People's Republic of China*,
　　75 Fed. Reg. 80458 (Dep't of Commerce Dec. 22, 2010)...................5

*Fresh Garlic from the People's Republic of China*,
　　76 Fed. Reg. 65172 (Dep't of Commerce Oct. 20, 2011) ..................5

*Fresh Garlic from the People's Republic of China*,
　　76 Fed. Reg. 37321 (Dep't of Commerce June 27, 2011)...................5

*Fresh Garlic from the People's Republic of China*,
　　77 Fed. Reg. 11486 (Dep't of Commerce Feb. 27, 2012) ..................5

*Initiation of Antidumping and Countervailing Duty Administrative Reviews
　　and Deferral of Administrative Review*,
　　74 Fed. Reg. 37690 (Dep't of Commerce July 29, 2009) ..................4

*Initiation of Antidumping and Countervailing Duty Administrative Reviews
　　and Request for Revocation in Part*,
　　74 Fed. Reg. 48224 (Dep't of Commerce Sept. 22, 2009)............................3, 22

*Initiation of Antidumping and Countervailing Duty Administrative Reviews
　　and Request for Revocation in Part*,
　　77 Fed. Reg. 77017 (Dep't of Commerce Dec. 31, 2012)...................4

*Laminated Woven Sacks from the People's Republic of China*,
　　73 Fed. Reg. 5801 (Dep't of Commerce Jan. 31, 2008)...................21

*Laminated Woven Sacks from the People's Republic of China*,
　　73 Fed. Reg. 35646 (Dep't of Commerce June 24, 2008)...................9

*Laminated Woven Sacks from the People's Republic of China*,
　　75 Fed. Reg. 49888 (Dep't of Commerce Aug. 16, 2010) ..................7

*Laminated Woven Sacks from the People's Republic of China*,
　　75 Fed. Reg. 55568 (Dep't of Commerce Sept. 13, 2010)......................2, 4, 7, 8

*Laminated Woven Sacks from the People's Republic of China*,
　　76 Fed. Reg. 14906 (Dep't of Commerce Mar. 18, 2011) ..........................passim

19907162

## STATEMENT OF RELATED CASE

In accordance with Rule 47.5(b) of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for Defendants-Appellees, the Laminated Woven Sacks Committee and its individual members, Coating Excellence International, LLC, and Polytex Fibers Corporation (the "Committee"), states the following.

1.    There have been no other appeals in or from the same civil action or proceeding in the lower court, the Court of International Trade ("Trial Court"), to the Court of Appeals for the Federal Circuit or any other appellate court.

2.    The following case concerning the second administrative review of the antidumping duty order on *Laminated Woven Sacks from China* could directly affect or could be directly affected by this Court's decision in the pending appeal: *AMS Associates Inc. v. United States*, Court No. 11-00148, 2012 Ct. Intl. Trade LEXIS 155 (Ct. Int'l Trade Dec. 18, 2012).

19907162

## STATEMENT OF THE ISSUE

In its determination below, the U.S. Department of Commerce ("Commerce") denied Zibo Aifudi Plastic Packaging Co., Ltd. ("Aifudi") a separate antidumping duty rate, because Aifudi failed to demonstrate an absence of *de jure* and *de facto* government control over its exports of subject merchandise to the United States.  The issue presented on appeal is:

Whether Commerce's decision to deny Aifudi a separate antidumping duty rate—based on the facts that Aifudi withdrew from the administrative review and ceased cooperating, demanded destruction of all of its business proprietary information ("BPI"), and prevented verification of its public information—is supported by substantial evidence and otherwise in accordance with law.

## STATEMENT OF THE CASE

This appeal concerns Commerce's decision to deny Aifudi a separate antidumping duty rate and assign it the 91.73 percent China-wide rate in the first administrative review of the antidumping duty order on *Laminated Woven Sacks from China*.  *See Laminated Woven Sacks from the People's Republic of China*, 76 Fed. Reg. 14906 (Dep't of Commerce Mar. 18, 2011) ("*Final Results*") (A028-032).  Pursuant to its longstanding separate rate analysis, Commerce preliminarily determined that Aifudi was eligible for a separate rate and, based on extensive sales and factors of production ("FOP") data, that Aifudi's dumping margin was

- 1 -

0.68 percent.  *See generally Laminated Woven Sacks from the People's Republic of China*, 75 Fed. Reg. 55568 (Dep't of Commerce Sept. 13, 2010) ("*Preliminary Results*") (A020-027).  In the *Final Results*, after Aifudi withdrew from the administrative review and ceased cooperating, demanded that all of its BPI be destroyed, and prevented verification of its public information, Commerce found that Aifudi significantly impeded the proceeding, pursuant to 19 U.S.C. § 1677e(a), and that adverse inferences were warranted, pursuant to section 1677e(b).  *Final Results*, 76 Fed. Reg. at 14908-09 (A030-031).  "Because of this, {Commerce found that it no longer had} any record evidence upon which to determine whether Zibo Aifudi is eligible for a separate rate for this period of review."  *Id.* at 14909 (A031).  Pursuant to longstanding agency practice, Commerce considered Aifudi "to be part of the PRC-wide entity and subject to the PRC-wide rate."  *Id.* (citation omitted).

Plaintiff-Appellant AMS Associates, Inc., d/b/a Shapiro Packaging ("Shapiro")[1] challenges Commerce's determination to deny Aifudi a separate rate and apply the China-wide rate; it does not challenge application of total adverse facts available ("AFA") to Aifudi.  *See* Principal Brief of Plaintiff-Appellant

---

[1] Aifudi is the affiliated Chinese producer for AMS Associates, a U.S. entity. *See generally* Aifudi Section A Response (Oct. 26, 2009) ("*Aifudi AQR*") (A203-250).  Throughout this response brief, "Shapiro" refers to the Plaintiff-Appellant and its affiliate, Aifudi.  "Aifudi" refers only to the Chinese producer/exporter respondent.

(Nov. 26, 2012) ("*Shapiro Br.*") at 7 and 17.  Shapiro asks this Court to reverse the

Trial Court's decision in *AMS Assocs., Inc. v. United States*, Court No. 11-00101,

2012 Ct. Intl. Trade LEXIS 100 (Ct. Int'l Trade July 27, 2012) (A011-019),[2] which

affirmed the *Final Results* on separate rate eligibility, and to remand to Commerce

with instructions to apply an AFA rate other than the China-wide rate.  *Shapiro Br.*

at 7-8 and 23.  This Court should affirm the Trial Court's decision.

## STATEMENT OF THE FACTS

This appeal arises out of Commerce's first administrative review of the

antidumping duty order on *Laminated Woven Sacks from China* concerning

imports entered during January 31, 2008 through July 31, 2009.  Commerce

initiated the review with respect to Aifudi and Changshu Xinsheng Bags Producing

Co., Ltd. ("Changshu").  *See Initiation of Antidumping and Countervailing Duty*

*Administrative Reviews and Request for Revocation in Part*, 74 Fed. Reg. 48224,

48225 (Dep't of Commerce Sept. 22, 2009) ("*Initiation Notice*")  (A1001-2).   In

the *Initiation Notice*, Commerce stated as follows: "For exporters and producers

who submit a separate-rate status application or certification and subsequently are

selected as mandatory respondents, these exporters and producers will no longer be

eligible for separate rate status unless they respond to all parts of the questionnaire

as mandatory respondents."  *Id*.  Commerce's initiation notices have routinely

---

[2]  Joint Appendix citations are to Trial Court Slip Opinion 12-98.

included this statement since 2009.[3]  Because Changshu timely withdrew its

request for review, Aifudi was the sole mandatory respondent.  *Preliminary*

*Results,* 75 Fed. Reg. at 55569 (A022).

Three primary issues arose during the review.  <u>First</u>, a disclosure in Aifudi's

U.S. sales reconciliation indicated that it failed to report certain U.S. sales of

laminated woven sacks ("LW Sacks" or "subject merchandise"), which had a value

of $6.6 million.  *See* Aifudi Sections C, D and Cost Reconciliation Response (Nov.

13, 2009) at Exhibit V-1, page 1 (A1278).[4]  Given the extensive unreported sales

and based on the good cause provision of Commerce's regulations (19 C.F.R. §

351.307(b)(1)(iv)), on December 30, 2009, the Committee requested verification of

Aifudi's responses (A1405).  Aifudi later would explain that it did not report the

sales because it believed that the country of origin of LW Sacks was determined by

the place of manufacture of the woven fabric used to produce those sacks.  Aifudi

claimed that the unreported sales were made from non-Chinese origin woven

fabric.  In response, Commerce strongly suggested that Aifudi should report all

U.S. sales regardless of the claimed origin of the fabric used in production.  *See*

---

[3] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Deferral of Administrative Review*, 74 Fed. Reg. 37690, 37691 (Dep't of Commerce July 29, 2009).  *See also Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 77 Fed. Reg. 77017, 77019 (Dep't of Commerce Dec. 31, 2012).

[4] Aifudi reported the publicly ranged $6.6 million value in Exhibit S5-C-1, page 1, of its Fifth Supplemental Questionnaire Response (July 7, 2010) (A1620).

- 4 -

Section C and D Supplemental Questionnaire (Jan. 14, 2010) at question 2 (A253).

Aifudi refused. *See* Aifudi Supplemental Section C response (Jan. 21, 2010) at 2-3

(A1416-17). No cash deposits were collected and liquidation was not suspended

on the unreported sales, because Shapiro declared to U.S. Customs and Border

Protection ("CBP") that the goods were non-subject merchandise.[5]

After the Committee challenged the country of origin reported to CBP,

Aifudi withdrew from the review, demanded that all of its BPI be destroyed, and

prevented verification of its public information. As a result, Commerce

determined in the *Final Results* that Aifudi was not entitled to a separate rate.[6]

Second, given Aifudi's refusal to report certain U.S. sales having a value of

$6.6 million based on its allegation that the LW Sacks did not originate in China,

Commerce had to determine whether the origin of the woven fabric determines the

country of origin of LW Sacks for purposes of the antidumping order. This

_____

[5] For a thorough summary of the unreported sales issue, *see* the Committee's Response to Shapiro's Rule 56.2 Memorandum In Support Of Its Motion For Judgment On The Agency Record (Dec. 21, 2011) at 4-9 (A1931-36).

[6] Commerce's practice is to deny separate rates to mandatory respondents that fail to respond to all parts of the questionnaire. *See, e.g., Fresh Garlic from the People's Republic of China*, 76 Fed. Reg. 65172, 65174 & n.18 (Dep't of Commerce Oct. 20, 2011) (partial preliminary results), *unchanged in final results*, 77 Fed. Reg. 11486, 11487 (Dep't of Commerce Feb. 27, 2012); *Fresh Garlic from the People's Republic of China*, 75 Fed. Reg. 80458, 80465 (Dep't of Commerce Dec. 22, 2010) (preliminary results), *unchanged in final results*, 76 Fed. Reg. 37321, 37323-24 (Dep't of Commerce June 27, 2011). Neither Aifudi nor Shapiro challenged this practice in the underlying review.

analysis was necessary to determine whether the unreported sales involved subject merchandise that had to be included in the calculation of Aifudi's dumping margin. *See* 19 U.S.C. § 1675(a)(2)(A)(ii) (Commerce "shall determine— (ii) the dumping margin for each such entry" of subject merchandise).  Using its standard "substantial transformation" analysis, Commerce found that the origin of the fabric does not determine the origin of LW Sacks.  *See, e.g., Laminated Woven Sacks from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the First Administrative Review* at Comment 1.b. (A1911-14).  Shapiro has not challenged this determination.

Third, in July and August 2010, the Committee demonstrated, based on Aifudi's raw material inventory records and known fabric consumption rates, that Aifudi did not have on hand sufficient quantities of non-Chinese origin woven fabric to produce the quantity of LW Sacks it claimed to have produced using such fabric.  In other words, Aifudi had reported a false country of origin for much of its woven fabric and, therefore, Shapiro had made unsupportable country of origin claims to CBP for certain entries of LW Sacks.  *See generally* the Committee's Comments On The Margin Calculations For {Aifudi} (July 21, 2010) (A1792-1844) and Additional Comments On The Margin Calculations For {Aifudi} (Aug. 30, 2010 (A1846-1901).  Aifudi objected to the Committee's submissions, stating

> We strongly object to Petitioner's inflammatory remarks
> of August 30, 2010 for a host of reasons, which we will

- 6 -

> set forth in detail in our case brief following verification.
> The significant point is that Aifudi has reported the
> correct factors of production and is prepared to prove the
> reliability of its figures at verification.

*See* Aifudi Response to Petitioners' Letter of August 30, 2010 (Sept. 9, 2010) at 1

(A1902).

On August 16, 2010, Commerce extended the date for its preliminary results

because it "need{ed} additional time to analyze and review Petitioner's newly

submitted allegations as well as to request and analyze additional information from

{Aifudi}." *See Laminated Woven Sacks from the People's Republic of China*, 75

Fed. Reg. 49888 (Dep't of Commerce Aug. 16, 2010) (extension of preliminary

results) (A1845).

On September 13, 2010, Commerce published the *Preliminary Results.*

Commerce preliminarily determined that Aifudi had demonstrated that it was free

from *de jure* and *de facto* government control over its exports of subject

merchandise and, using the extensive data submitted by Aifudi,[7] Commerce

calculated a preliminary dumping margin of 0.68 percent. *Preliminary Results*, 75

Fed. Reg. at 55570-73 (A023-026). Commerce emphasized, however, that the

imported fabric issue was not resolved:

> Petitioners raised concerns regarding Zibo Aifudi's FOPs
> for the production of woven sacks from imported woven

---

[7] Before Aifudi withdrew from the review, it submitted at least six
supplemental questionnaire responses.

> fabric and we sought additional information from Zibo
> Aifudi regarding its production of woven sacks from
> imported woven fabric. At this time, we are still
> examining this matter and may issue additional
> supplemental questions regarding Zibo Aifudi's material
> consumption and production process for woven sacks
> produced from imported woven fabric. For the
> preliminary results, we have determined to use Zibo
> Aifudi's reported FOP data, specifically Zibo Aifudi's
> FOPs used to produce woven sacks from imported woven
> fabric, to calculate its margin. However, we intend to
> continue to analyze this issue for the final results.

*Id.* at 55573 (A026).

Seven days after publication of the *Preliminary Results*, Aifudi informed

Commerce that it would no longer cooperate in the review and demanded that all

of its BPI be destroyed. *See* Aifudi's Withdrawing from Administrative Review

(Sept. 20, 2010) ("*Aifudi Withdrawal Letter*") (A306). On the same day, Shapiro

filed an entry of appearance (A309).

On September 30, 2010, Commerce informed Aifudi that it had destroyed all

of the BPI Aifudi had placed on the record and asked all other interested parties to

do the same. The relevant parties confirmed destruction of Aifudi's submitted BPI

on October 6, 2010. *Final Results*, 76 Fed. Reg. at 14907 (A029).

On October 14 and October 19, 2010, the parties filed case and rebuttal

briefs. *Id.*

In the *Final Results*, because Aifudi ceased to cooperate, demanded that all

of its submitted BPI be destroyed, and "prevented verification of information it had

- 8 -

earlier provided," Commerce determined that Aifudi "significantly impeded" the review and failed to cooperate "to the best of its ability." Aifudi's dumping margin was therefore based on AFA, pursuant to 19 U.S.C. § 1677e(a) and (b). *Id.* at 14908 (A030). Because Commerce found that it no longer had "any record evidence upon which to determine whether Zibo Aifudi is eligible for a separate rate for this period of review," it denied Aifudi a separate rate. *Id.* at 14908-09 (A030-031). Pursuant to agency practice, Commerce considered Aifudi "to be part of the PRC-wide entity and subject to the PRC-wide rate." *Id.* at 14909 (A031) (citation omitted).

Because Aifudi was the sole mandatory respondent and was determined to be part of the China-wide entity, Commerce found "it necessary, under section 776(a)(2) of the Act, to continue to use facts otherwise available as the basis for the final results of this review for the PRC-wide entity." *Id.* The selected China-wide rate was 91.73 percent. This rate was first adopted in the original investigation, where it was obtained from the petition and corroborated by comparison to model-specific dumping margins calculated for Aifudi, a mandatory respondent in the investigation. *See Laminated Woven Sacks from the People's Republic of China*, 73 Fed. Reg. 35646, 35648 (Dep't of Commerce June 24, 2008). Commerce properly relied on that corroboration in the underlying review.

*Final Results,* 76 Fed. Reg. at 14909-10 (A031-032).  Shapiro has not challenged the calculation of the China-wide rate.

## SUMMARY OF THE ARGUMENT

After achieving a favorable preliminary margin of 0.68 percent, Aifudi withdrew from the review, demanded that all of its BPI be destroyed, and prevented verification of its public information.  Commerce properly refused to consider the public information that remained on the record, because it could not be verified.  Moreover, the unverified public information that remained on the record does not establish that Aifudi was free from government control.  Thus, substantial evidence supports Commerce's finding that Aifudi failed to affirmatively demonstrate an absence of *de jure and de facto* government control over its exports of subject merchandise to the United States and Commerce's determination that Aifudi is not eligible for a separate rate.

The four cases cited by Shapiro to support its claim that Commerce's determination to deny Aifudi a separate rate is contrary to law are inapposite.   In those cases, the Trial Court reversed Commerce's decisions to deny separate status based on deficiencies in respondents' data used to calculate dumping margins.  In those cases, unlike this case, the respondents continued to participate in the reviews, their separate rate responses (both confidential and public) remained on the record, and the information in those responses was successfully verified.  By

- 10 -

sharp contrast, Aifudi ceased to cooperate in the underlying review, demanded that all of its BPI be removed from the record, and prevented verification of the public data that remained on the record.  Thus, Commerce's decision to deny Aifudi a separate rate is not contrary to law.

**ARGUMENT**

## I.    STANDARD OF REVIEW

In reviewing decisions of the Trial Court, this Court "applies anew the standard of review applied by that court to the agency's decision."  *Thai Pineapple Pub. Co. v. United States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999).  *Accord, Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1393 (Fed. Cir. 1997).  The applicable standard of review requires this Court to "hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B).  "'Substantial evidence' has been defined as 'more than a mere scintilla,' as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Micron Tech*, 117 F.3d at 1393, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

## II.    COMMERCE'S DECISION TO DENY AIFUDI A SEPARATE RATE IS SUPPORTED BY SUBSTANTIAL EVIDENCE

In antidumping cases involving imports from a non-market economy ("NME") such as China, a respondent is presumed to be part of the country-wide

- 11 -

entity unless it "affirmatively demonstrates" an absence of both *de jure* and *de facto* government control over exports of subject merchandise to the United States. *Sigma Corp. v. United States*, 117 F.3d 1401, 1405 (Fed. Cir. 1997) ("We agree with the government that it was within Commerce's authority to employ a presumption of state control for exporters in a nonmarket economy, and to place the burden on the exporters to demonstrate an absence of central government control."); *see also Transcom, Inc., v. United States,* 294 F.3d 1371, 1373 (Fed. Cir. 2002). A respondent that fails to make this demonstration will be assigned the China-wide rate. *Sigma Corp.*, 117 F.3d at 1405. Where, as here, all respondents in an NME proceeding are found to be uncooperative and assigned margins based on AFA, the China-wide rate will be based on AFA. *Final Results*, 76 Fed. Reg. at 14909 & n.18 (A031).

In the *Final Results,* after Aifudi withdrew from the administrative review and ceased cooperating, demanded destruction of all of its BPI, and prevented verification of its public information, Commerce found that Aifudi had "significantly impeded" the review, pursuant to 19 U.S.C. § 1677e(a), and that application of adverse inferences was warranted, pursuant to section 1677e(b). *Id.* Shapiro does not challenge these findings. *Shapiro Br.* at 7 and 17. Commerce also determined that Aifudi was not eligible for a separate rate, because the record no longer supported such a finding. *Final Results,* 76 Fed. Reg. at 14908 (A030).

Shapiro challenges this determination, arguing that the unverified public record contains the evidence necessary for a separate rate. *Shapiro Br.* at 8-17. Shapiro is wrong.

### A.    Commerce Properly Refused To Consider Public Information That Could Not Be Verified

Commerce properly refused to consider Aifudi's public information after Aifudi withdrew from the review and thus prevented verification of that information. Consequently, Commerce properly found that Aifudi failed to demonstrate eligibility for a separate rate. *Sigma Corp.*, 117 F.3d at 1405. Shapiro argues that the public record contains sufficient evidence to establish Aifudi's eligibility for a separate rate. *Shapiro Br.* at 8-16. In fact, none of the public information remaining on the record after Aifudi withdrew can be used for any purpose, because Aifudi prevented verification of that information. Commerce is not required to rely on information that cannot be verified, *see e.g.*, 19 U.S.C. § 1677e(a)(2)(D), and there is no meaningful distinction between refusing to allow or preventing verification and a total verification failure.

In the *Final Results,* Commerce explained why it could no longer find that Aifudi had demonstrated its separate-rate eligibility:

> In the *Preliminary Results*, we found that the one mandatory respondent (*i.e.*, Zibo Aifudi) demonstrated its eligibility for separate-rate status. However, we no longer find Zibo Aifudi eligible for separate rate status as it has significantly impeded the Department's ability to conduct

- 13 -

> this proceeding and, by withdrawing from the review, <u>prevented the verification of the information it had earlier provided</u>.

*Final Results,* 76 Fed. Reg. at 14908 (emphasis added) (A030).  Commerce further

explained why it was necessary to use facts available:

> In addition, we find that an element of the PRC-wide entity (Zibo Aifudi) did not respond to our requests for information, the necessary information was not provided, <u>and the information that was provided was unable to be verified</u>. Therefore, we find it necessary, under section 776(a)(2) of the Act, to continue to use facts otherwise available as the basis for the final results of this review for the PRC-wide entity.

*Id.* at 14909 (emphasis added) (A031).  In its brief to this Court, Shapiro ignores

Commerce's repeated findings that none of its factual information submissions

could be verified.

"Commerce may refuse to consider any information submitted by a

respondent that cannot be verified."  *Since Hardware (Guangzhou) Co. v. United*

*States*, No. 09-00123, 2011 Ct. Intl. Trade LEXIS 146, at *22 (Ct. Int'l Trade

Nov. 29, 2011).  Commerce may reject unverified information even where it is

"not required to verify ... {but chooses} to exercise its discretion to conduct ...

verification."  *Id.* at *22-23.  When a respondent refuses to allow verification of

submitted information relating to separate rate eligibility, Commerce may find that

the respondent has failed to demonstrate eligibility for a separate rate and may

therefore apply the China-wide rate.  *Hontex Enters., Inc. v. United States*, 248 F.

- 14 -

Supp. 2d 1323, 1326 n.3 (Ct. Int'l Trade 2003) ("Because HFTC5 refused

verification of its submitted information, ... Commerce was justified in assigning it

the PRC-wide rate.").

Given the statutory requirement for verification, 19 U.S.C. § 1677m(i), the

Federal Circuit has emphasized the necessity for submitting verifiable information.

*See, e.g.*, *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009);

*Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).  In

addition, the statutory provision for resort to facts available, 19 U.S.C. § 1677e(a),

underscores the requirement for verifiable information.  *See, e.g., Nippon Steel*,

337 F.3d at 1381 (quoting Statement of Administrative Action for the Uruguay

Round Agreements Act, H.R. Doc. No. 103-316 (1994), at 869-70, *reprinted in*

1994 U.S.C.C.A.N. 4040, 4198-99) ("New section 776(a) requires Commerce ... to

make determinations on the basis of facts available where the requested

information is missing from the record or cannot be used because, ... Commerce

could not verify the information.").

In *Hontex Enterprises*, 248 F. Supp. 2d 1323, Commerce selected

respondent HFTC5 as a mandatory respondent and sent it the standard antidumping

questionnaire.  Although HFTC5 responded to the questionnaire, it refused to

allow verification of its responses.  *Id*. at 1325-26.  Commerce assigned HFTC5

19907162

the China-wide rate of 201.63 percent, because HFTC5 refused to allow

verification.  *Id.*  The Trial Court affirmed, explaining as follows:

> Because HFTC5 refused verification of its submitted
> information, Commerce was unable to ascertain whether
> HFCT5 had rebutted the presumption of state control that
> attaches in NME investigations such that it was entitled
> to a separate company-specific antidumping duty margin.
> Because HFTC5, by its repeated refusals to submit to
> verification of its questionnaire responses, did not rebut
> the presumption of state control Commerce was justified
> in assigning it the PRC-wide rate of 201.63 percent.

*Id.* at 1326 n.3 (internal citation and quotation omitted).

Similarly, when a respondent fails verification Commerce disregards the

submitted information and applies facts available.  *See, e.g.*, *Heveafil Sdn. Bhd. v.

United States*, 58 Fed. App'x. 843, 847 (Fed. Cir. 2003); *Thyssen Stahl AG v. AK

Steel Corp.*, No. 1997-1509, 1998 U.S. App. LEXIS 17064, at *13-14 (Fed. Cir.

July 27, 1998); *Bristol Metals, L.P. v. United States*, 703 F. Supp. 2d 1370, 1373

(Ct. Int'l Trade 2010); *see also PAM, S.p.A.*, 582 F.3d at 1339 ("If an interested

party ...  provides information that cannot be verified, the administering authority

'shall ... use the facts otherwise available in reaching' its decision on an

antidumping issue.").

In this case, Commerce was unable to verify Aifudi's responses because

Aifudi withdrew from the review prior to verification.  *Aifudi Withdrawal Letter* at

1 (A306).  Accordingly, Commerce properly refused to consider any of Aifudi's

- 16 -

public information in the *Final Results* because that information could not be verified. *Final Results,* 76 Fed. Reg. at 14908-09 (A030-031). That determination is supported by substantial evidence and otherwise in accordance with law. *See Hontex Enters.*, 248 F. Supp. 2d at 1326 n.3; *see also PAM, S.p.A.*, 582 F.3d at 1339 (prescribing use of facts available where respondent's information is unverifiable).

In sum, without citing any supporting authority, Shapiro seeks a ruling from this Court <u>requiring</u> Commerce to rely on information that could not be verified when determining Aifudi's separate rate eligibility. Shapiro's position is both inconsistent with extensive precedents and contrary to the policy of promoting cooperation by respondents in submitting accurate, verifiable information. *See, e.g., F. Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) (holding that a lawful AFA rate should "create the proper deterrent to non-cooperation"). Accordingly, substantial record evidence supports Commerce's determination that Aifudi is not eligible for a separate rate, because the public information that remains on the record could not be verified.

### B. Even If Commerce Were Required To Consider The Public Information Remaining On The Record After Aifudi Withdrew And Prevented Verification, That Information Does Not Establish That Aifudi Was Free From Government Control

Shapiro incorrectly argues that the public record "affirmatively establishes that Aifudi operated free from government control and was entitled to a separate

- 17 -

rate." *Shapiro Br*. at 12.  First, as discussed in the Section II.A., above, Commerce

found that Aifudi's actions "prevented the verification of the information it had

earlier provided." *Final Results,* 76 Fed. Reg. at 14908 (A030).  Information that

cannot be verified cannot be relied upon for any purpose—particularly not for

making a decision that benefits the uncooperative respondent.  Second, Shapiro

downplays the fact that crucial portions of Aifudi's responses to initial and

supplemental separate rate questions no longer are on the record.[8]  In fact, even if

Commerce were required to consider the public information remaining on the

record after Aifudi withdrew from the review, that information does not establish

that Aifudi was free from government control and thus eligible for a separate rate.

### 1.    Shapiro improperly attempts to shift the burden of proof to Commerce

As an initial matter, although this Court has held that Commerce properly

"place{d} the burden on the exporters to demonstrate" separate rate eligibility,

*Sigma Corp.*, 117 F.3d at 1405-06, Shapiro argues that Commerce was required to

attempt to reconstruct the separate rate response in order to determine whether

Aifudi has met this burden—even after Aifudi withdrew from the review, ceased to

participate, and prevented verification.  *Shapiro Br*. at 10.  Citing no authority,

---

[8] The initial separate rate questions are found in Part 2 of the standard NME Section A questionnaire ("*Initial Separate Rate Q'aire*") (A1007-1106). Supplemental separate rate questions are found in Commerce's Supplemental A and C Questionnaire (Dec. 23, 2009) ("*Supplemental Separate Rate Q'aire*") at 3-4 (A1975-1987).

Shapiro asserts that "{u}nder the applicable standard of review, Commerce was required to examine the public record to determine whether or not Aifudi operated free of Chinese government control." *Id.* No statute, regulation, or judicial or administrative precedent requires Commerce to "examine the public record" in this way after a respondent withdraws, ceases to participate, and prevents verification of its responses. In effect, Shapiro attempts to improperly shift Aifudi's burden of proof to Commerce.

> ### 2. The public record does not establish that Aifudi operated free from government control

Although the public record contains Aifudi's responses to some of the information requests that are relevant to the separate rate issue, the following examples demonstrate critical deficiencies that disqualify Aifudi from a separate rate, even if Commerce were to ignore the fact that such responses could not be verified.

The initial questionnaire required submission of a documented discussion explaining how Aifudi established its U.S. prices. *Initial Separate Rate Q'aire*, Question 2.g. (A1018). Exhibit A-4 to the *Aifudi AQR* included three confidential documents intended to demonstrate price negotiations (A199-202). Because complete versions are no longer on the record, Aifudi has not demonstrated that it established its U.S. prices free of government control.

The supplemental separate rate questionnaire instructed Aifudi to "provide a sample document showing the interim price negotiation process." *Supplemental Separate Rate Q'aire*, Question 6. (A1978).  Aifudi provided four pages of confidential documents at Exhibit S1-3 of its Response ... To First Supplemental Questionnaire (Jan. 14, 2010) ("*Aifudi 1st SQR*") (A280-283).  Because complete versions are no longer on the record, Aifudi has not demonstrated that its U.S. price negotiations were free from government control.

Aifudi was instructed to "provide payment documentation for all entities involved in the sales chain." *Supplemental Separate Rate Q'aire*, Question 8 (A1978).  Aifudi provided 14 pages of confidential documents at Exhibit S1-4 of the *Aifudi 1st SQR* (A284-305).  Because complete versions are no longer on the record, Aifudi has not demonstrated that the payment process for its U.S. sales was free from government control.[9]

---

[9] Shapiro incorrectly argues that it was impermissible *post-hoc* rationalization for the "Appellees herein" to have argued during the Trial Court phase that Commerce's denial of a separate rate was lawful, based on the deficiencies in the public record.  Shapiro claimed that the arguments "do not reflect the reasoning contained in Commerce's final results." *Shapiro Br. at* 10-11.  Shapiro is wrong.  Commerce determined that it "does not have any record evidence upon which to determine whether Zibo Aifudi is eligible for a separate rate" and it repeatedly stated that the public information remaining on the record could not be verified. *Final Results*, 76 Fed. Reg. at 14909 (emphasis added) (A031).  Accordingly, arguments concerning the critical deficiencies in the public record are not *post-hoc* rationalization.

Given the foregoing deficiencies, Aifudi failed to demonstrate eligibility for a separate rate. Indeed, this Court has affirmed Commerce's denial of a separate rate based on deficiencies concerning price negotiations and responsibility for prices. *Sigma Corp.,* 117 F.3d at 1406. Furthermore, Commerce does not grant a separate rate to applicants that fail to cure deficient responses, and Aifudi's public separate rate response is clearly deficient. *See, e.g., Laminated Woven Sacks from the People's Republic of China*, 73 Fed. Reg. 5801, 5802 (Dep't of Commerce Jan. 31, 2008) (LTFV preliminary determination) (rejecting two separate rate applications because of deficiencies).

Moreover, Shapiro "does not contest the application of AFA as to Aifudi," *Shapiro Br.* at 7, and Commerce applied AFA to Aifudi because it failed to cooperate. *Final Results,* 76 Fed. Reg. at 14908-09 (A030-031). The deficiencies in the record and Aifudi's failure to cooperate support Commerce's determination to deny Aifudi a separate rate. "{W}here an NME exporter fails to either: (1) rebut the nonmarket economy presumption of state control, or (2) otherwise cooperate with the investigation by failing to 'respond to Commerce's questionnaire for that review,' Commerce may then apply the NME-wide antidumping duty margin to such exporter's merchandise." *Shandong Huarong Gen. Group Corp. v. United States*, 27 CIT 1568, 1592 (Ct. Int'l Trade 2003) (quoting *Sigma Corp.*, 117 F.3d at 1411).

Finally, the *Initiation Notice* for the underlying review provided clear notice to Aifudi that if it refused to submit complete questionnaire responses or demanded destruction of its BPI responses it would not receive a separate rate. *Initiation Notice*, 74 Fed. Reg. at 48224 (A1001). "By choosing not to participate in the review" Aifudi knowingly "risked the consequences of {its} inaction." *Huaiyin Foreign Trade Corp. (30) v. United States*, 201 F. Supp. 2d 1351 (Ct. Int'l Trade 2002), *aff'd*, 322 F.3d 1369 (Fed. Cir. 2003) (affirming application of the China-wide rate to parties that chose not to participate in the review and seek separate rates).

In sum, substantial record evidence supports Commerce's determination that Aifudi is not eligible for a separate rate based on the public record, even if Commerce were to ignore the fact that none of the public information could be verified. Accordingly, the Trial Court properly determined that "there remains insufficient information on the record to permit Commerce to determine a separate rate for Aifudi." *AMS Assocs.*, Slip Op. 12-98 at 8 (A018). No basis exists for disturbing the Trial Court's decision.

## III. COMMERCE'S DECISION TO DENY AIFUDI A SEPARATE RATE IS NOT CONTRARY TO LAW

In Section III of its brief, Shapiro argues that denial of a separate rate is contrary to law because "the public administrative record confirms that ... Aifudi operated free from Chinese government control." *Shapiro Br*. at 17. Shapiro next

asserts that "application of the county-wide rate to a respondent that has demonstrated its entitlement to a separate rate has been found to be unlawful by the lower court on numerous occasions." *Id*. at 18.  The four cases Aifudi cites, however, do not require Commerce to grant a separate rate where the respondent has <u>failed</u> to demonstrate eligibility for such a rate, as is the case with Aifudi.

The cases cited by Shapiro are easily distinguishable.   As explained in Section II, Aifudi <u>failed</u> to demonstrate its entitlement to a separate rate, because it withdrew from the review, requested removal of all of its BPI from the record, and prevented verification of its public information that remained in the record.  By contrast, in the four cases cited by Shapiro, Commerce declined to grant separate rates solely because the respondents had deficiencies in the information used to calculate dumping margins—not information used to determine separate rate eligibility.   On appeal, the Trial Court reversed Commerce's denials of separate rates (while affirming the AFA determinations), <u>because</u>, unlike Aifudi, the respondents continued to participate in the respective reviews, their complete separate rate responses (both confidential and public) remained on the record, and those responses were successfully verified.[10]  Accordingly, the cases cited by

---

[10] *See Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231, 1244 (Ct. Int'l Trade 2009); *Gerber Food (Yunnan) Co. v. United States*, 491 F. Supp. 2d 1326, 1350-51 (Ct. Int'l Trade 2007); *Gerber Food (Yunnan) v. United States*, 387 F. Supp. 2d 1270, 1279 & 1288 (Ct. Int'l Trade 2005); and *Shandong Huarong*, 27 CIT at 1595.

- 23 -

Shapiro do not contain any basis for concluding that Commerce's decision to apply

the China-wide rate to Aifudi was contrary to law.  In fact, Shapiro cites no case

requiring Commerce to grant a separate rate to a respondent that, like Aifudi,

withdrew from the review, demanded destruction of its BPI separate rate

information, and prevented verification of its public separate rate information.

## CONCLUSION

Substantial record evidence supports Commerce's determination that Aifudi did not demonstrate an absence of *de jure* and *de facto* government control over its exports of subject merchandise to the United States.  Accordingly, Commerce properly determined that Aifudi is not eligible for a separate rate.  Furthermore, the four cases cited by Shapiro in support of its assertion that Commerce's determination is contrary to law are inapposite, because none involved deficiencies in the respondents' separate rate information.  Accordingly, this Court should affirm the Trial Court's decision.

Respectfully submitted,

*/s/ Joseph W. Dorn*
Joseph W. Dorn
Jeffery B. Denning

KING & SPALDING LLP
1700 Pennsylvania Ave. N.W.
Washington, DC  20006
202-737-0500

*Counsel for Laminated Woven Sacks Committee, Coating Excellence International, LLC and Polytex Fibers Corporation*

January 22, 2013

**AMS ASSOCIATES, INC. V UNITED STATES**
**CAFC NO. 2012-1688**

<u>**CERTIFICATE OF SERVICE**</u>

This is to certify that I have on the 22nd day of January, 2013 caused a copy of the foregoing **RESPONSE BRIEF OF DEFENDANTS-APPELLEES, LAMINATED WOVEN SACKS COMMITTEE, COATING EXCELLENCE INTERNATIONAL, LLC, AND POLYTEX FIBERS CORPORATION** to be served upon the following parties via the method indicated at the following addresses:

<u>**VIA CM/ECF:**</u>

Lizbeth Robin Levinson
**Kutak Rock**
Suite 1000
1101 Connecticut Ave., N.W.
Washington, DC 22205
liz.levinson@kutakrock.com

Tara K. Hogan
**Department of Justice**
Commercial Litigation Branch, Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
tara.hogan@usdoj.gov

*/s/ Joseph W. Dorn*
Joseph W. Dorn
**KING & SPALDING LLP**
1700 Pennsylvania Avenue, NW
Washington, DC   20006
(202) 737-0500

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B)(i). Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B)(iii), this brief includes 5,623 words.

This brief has been prepared in Microsoft Office Word 2003 using a proportionally spaced typeface (14 point Times New Roman font). In preparing this certificate, the undersigned has relied upon the word count feature of this word-processing system as permitted by Fed. R. App. P. 32(a)(7)(C)(i).

*/s/ Joseph W. Dorn*
Joseph W. Dorn
Jeffery B. Denning
KING & SPALDING LLP

Counsel for Defendants-Laminated Woven
Sacks Committee, Coating Excellence
International, LLC, and Polytex Fibers
Corporation

Dated: January 22, 2013